326 So.2d 695

**Kenneth Ray BARTON**

**v.**

**STATE.**

**4 Div. 376.**

Court of Criminal Appeals of Alabama.

Nov. 18, 1975.

Rehearing Denied Dec. 16, 1975.

James M. Prestwood, Andalusia, for appellant.

William J. Baxley, Atty. Gen., and Gary R. Maxwell, Asst. Atty. Gen., for the State.

CATES, Presiding Judge.

This case originated under an indictment in Covington County which was transferred to Pike for trial.

The appeal is from an involunatry manslaughter conviction, which came from a jury's verdict which also fixed a fine of $500.00 and carried a sentence of twelve months imprisonment in the county jail. On the defendant's failure to pay the fine and costs or confess judgment therefor, the court additionally sentenced Barton to serve 145 days for the fine and 135 days for the costs of $403.85.

I

On the night of Friday, April 19, 1974, about 8:30 or 9:00 p. m., K. M. Lassiter, a highway patrolman, stopped Kay Lord on US 331 north of Opp. She had been going south driving 61 mph in a 55 mph zone. Officer Lassiter, after giving her a warning ticket, was preparing to get back in his patrol car when a pickup truck sideswiped Miss Lord's MG, the patrol car, and struck Lassiter. Lassiter was dead when he was brought to the hospital in Opp.

The investigators for the Department of Public Safety and "criminalists" from the Toxicologist's office collected broken chrome strips and other debris from the two sideswiped cars.

The State produced as a witness Billy Joe Coon, employed by a contractor engaged in work at a nursing home on the north side of Opp. At the job site was a trailer used as the job office. It had a refrigerator which on the afternoon of April 19 had a stock of beer. The appellant drove up in his Chevrolet pickup truck. Also there was "Slick" Dority who was tending the trailer that weekend for the general contractor.

Barton brought and unloaded some equipment to be used later by his crew— he being the masonry subcontractor.

Coon and Barton engaged in target practice and all three men drank beer, then about dark they went to the Red Wagon. There, according to Coon, each bought a round of beer and then went back to the nursing home. There Barton got in his truck and drove off. Coon saw no one else in the vehicle; he thought it was 8:35 or 8:40 p. m.

The next morning Barton's father brought the truck in to the Sheriff's office. It had been badly torn up on the left front side. The appellant rode into Andalusia with his father.

J. B. Pemberton, an investigator with the Department of Public Safety, took appellant to an upstairs office in the court house. He administered the *Miranda* warnings to Barton. The State—though contradicted by the defense—made sufficient showing of voluntariness to support the trial's judge's ruling that Barton's statement could go to the jury.

We quote in part from Officer Pemberton's testimony relating his interrogation of the appellant:

"And got off at about 4:00 P.M. I stayed around the nursing home and was working on a fork lift. With me was a man whose last name is Coon, white male about thirty

to thirty-two who lives in Opp, Alabama.

"Q. Said he was with a man named Coon about 30 to 32 years old?

"A. Lived in Opp, Alabama.

"Q. All right.

"A. And a white male who is about fifty and he goes by the name of Slick who I think lives in Anniston, but stays in a trailer which belongs to O. V. Industries and is located there at the nursing home. We were all drinking beer, Bud and Schlitz, and I dranked a lot and I was drunk.

\*     \*     \*     \*     \*     \*

"Q. Continue please?

"A. We decided to leave and they told me I couldn't drive for I was too drunk. I had dranked several beers before I started drinking with them. I had went out to Donaldson's Grocery and bought a 6 pack of Schlitz about 2:30 P.M.

"Q. What time was that?

"A. Two thirty P.M.

"Q. And that's talking about the day before on the 19th?

"A. Friday the 19th. And dranked this before quitting time. I had also dranked some that morning that I had bought at the same place.

\*     \*     \*     \*     \*     \*

"Q. Please continue.

"A. We left the nursing home in Coon's car, about a '66 Chevrolet, grey, with Coon driving and we went somewhere where there was loud music and dancing. I drank several beers and some mixed drinks while there. It was dark when we went there, but I don't know what time it was. I was too drunk to recognize anyone there that I knew. I don't even remember leaving this place. I don't even remember being in the pickup truck at all last night. It was left at the nursing home when we went to this joint or dance hall. I got off stool to dance and hit the floor and I don't remember anything from there until about 10:15 A.M. this morning. My mother called. The telephone was what woke me up. I was at my home in bed. I answered telephone and it was my mother, Beatrice Barton, who lives nearby. She called to find out how my father-in-law, Tom Rawls, was. We talked about this for about five minutes. Mother asked me had I heard the news and I said, no, and she said you remember that patrolman that kept you from bleeding to death last year. I said, yes. She said somebody run him down last night. I said, 'Oh, good Lord,' and asked her if they had found out who done it. She said, no, they got a statewide search out looking for him. This was the first time I heard anything about the patrolman and remarked to her that it looks like you can't even walk out into your back yard now without getting run over or shot by black panthers or some revolutionist of some kind. Then I went back and lay down and went to sleep. In a little bit I heard someone driving up, because my dog barked and it was my daddy, Fletcher Barton. I got up when he came into the house and went into the kitchen where he was. We discussed a fence and the problem we had regarding said fence. We walked out back and got a pack of cigarettes out of the right side of my truck. When I walked around I saw the truck was bent up on the left side and I said, 'Oh, my God, somebody has tore my truck up again. Then I stood there and looked at the truck and could see what looked like blood. I remembered then what my mother had said about the trooper being run down and she told me that they had said over the radio that they had a hub cap and a head lamp. That's when I noticed both of my hub caps on the driver's side were gone. I said to daddy that this might be the truck that they are looking for because the hub caps missing and mother told me that the pickup was a late model that they were looking for. I told daddy I was going to carry the pickup down to the sheriff's office. Daddy said no you can't drive, but I'll drive you down there. I was still in kind of bad shape. We left and

came to sheriff's office and met Glenn Chambers, a deputy, and asked him to go look at the pickup and see if he could tell me if that was the one involved in that last night of running Mr. Lassiter down. After looking the truck over Deputy Chambers said I am not positive, but I think it is. He looked the truck over and said it looked like where his (Lassiter) head hit the windshield. I said well, good Lord, let's get something straight. If I was on that pickup and I done it I want to know it. We came back inside the sheriff's office. This was about 12 noon. We sat around the sheriff's office and I guess the sheriff called somebody, for in a little while, about ten to fifteen minutes later Mr. Brewer came in.

"I never go up U.S. 331 after work to go home or I never come that way coming to work. If I was going up 331 to go home I would have to go to Brantley I reckon to get back to Gant. [Barton lived on the Gant-Red Level road.]

"I do own the '73 Chevrolet pickup that I came to the sheriff's office in. I came to work at about seven A.M. yesterday in my pickup. The last time I drove it was about 2:00 P.M. I went to a place which is south of Opp going toward Florala. It is about two miles south of Opp. I don't know the name of it, but it's got a neon light in front of it. It's a little grocery store that sells beer. It's on the right hand side going south. I bought two beers there.

"All this time my truck was not bent up. The last time I saw my pickup on the past date was about 4:15 P.M. at the nursing home. I pulled it up by the fork lift we were working on. The truck did not have the windshield broke out at this time.

"I have told you the truth as far as I can remember."—bracketed matter added.

Pemberton also asked Barton what clothes he had worn the night before. It turned out that Mrs. Barton had already washed them except for his socks and shoes. Pemberton took these and put them in a plastic bag which he turned over to one of the assistant toxicologists.

Slivers of glass were found in the socks and shoes (Defendant's Exhibits C and D). Tellis Hudson, who was qualified by the trial judge as a forensic "criminalist" testified that the glass from the shattered truck windshield and the slivers from Exhibits C and D had the same density and refractive index. R. 168.

Earlier Hudson had testified on direct examination:

"Q. * * * Tell the jury about the differences in glass. Let me ask you this question, I withdraw that. Glass from way up one side, the left top of the windshield, could be different in density and what do you call it?

"A Refractive index.

"Q. Refractive index. Than glass slivers from the lower right hand corner is that correct?

"A. I am saying it possibly could be.

"Q. Possibly could be different is that what you are saying?
"A. Yes, sir.

"Q. But did I hear you testify that all of the teaching and materials you have read and the tests you have seen conducted show that when these characteristics are identical then in your opinion they came from the same little area, or the opinion of experts they came from the same area, is that right.

"A. From the same area or fairly close. No more than I know about the glass industry, I do know that when glass is made or melted there is no way in the world, I mean there is no substance or thing known to be able to stir molted glass. It will melt anything that stirs it. In fact, it even destroys the vat that it is in gradually. So there is no way to stir it, so any place in-

side the vat is going to be different from another place.

"Q. Any place inside is going to be different from another place in refractive index and density?

"A. It would be highly improbable to pour two sheets of glass with the same density and refractive index."

There was sufficient evidence, which if credited to the required degree, supports the verdict.

## II

The maximum imprisonment for manslaughter in the second degree is one year in the county jail (or at hard labor if the jury so specifies). Code 1940, T. 14, § 322. This, under *Williams v. Illinois*, 399 U.S. 235, 90 S.Ct. 2216, 26 L.Ed.2d 571, precludes further imprisonment of an indigent to work out the fine and costs, under the equal protection clause of the Fourteenth Amendment.

However, although the defendant testified that he had liabilities of $60,000 and assets at the time of sentencing of $15,000 or $16,000, we note that he made a $3,000 bond on taking his appeal.[1] The trial judge did not rule on whether Barton was an indigent.

In the opinions of the Supreme Court of the United States it is clear that a pauper payment of fine and costs cannot carry imprisonment beyond the maximum for the crime, i.e., one year in this case. Equally, that court has treated the civil obligation to pay fine and costs as one for which the contempt power may be used if the convict defaults on reasonable installments.

The critical time for the application of *Williams v. Illinois*, supra, is when the primary term of incarceration ends. In this case the appellant may treat the judgment as an inchoate one with either civil or criminal aspects, at least until he ends his first year's servitude in the county jail. At that point, if he still considers himself an indigent, he may proceed by way of habeas corpus. *Short*, 46 Ala.App. 445, 243 So.2d 529; *In Re Jackson*, 26 Ohio St.2d 51, 268 N.E.2d 812; *Rutledge v. Turner* (Okl.Crim.), 495 P.2d 119.

After review under Code 1940, T. 15, § 389, the judgment below is

Affirmed.

All the Judges concur.

## ON REHEARING

CATES, Presiding Judge.

On rehearing[2] appellant claims that the statement that Lassiter once saved Barton's life was a canard.

We do not think the truth of that assertion [which appears in the statement given by Barton to Pemberton quoted above, see p. 697 of this Ms] was an issue in the trial. That Pemberton wrote it out comes down to the credit to be attached to a peripheral part of his testimony. He claimed that was part of what Barton told him.

Application overruled.

All the Judges concur.

---

1. See f.n. 5, *Williams v. Illinois*, 399 U.S. 235, 90 S.Ct. 2216.

2. Neither brief of appellant complies with Rule A, 49 Ala.App. XXI, or Rule 28(a)(7) ARAP.